**[J-104-2018] [MO: Todd, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| SAFE AUTO INSURANCE COMPANY | : | No. 26 MAP 2018 |
| | : | |
| | : | Appeal from the Order of the Superior |
| v. | : | Court dated September 18, 2017, |
| | : | Reconsideration Denied October 31, |
| | : | 2017, at No. 3226 EDA 2016 Affirming |
| RENE ORIENTAL-GUILLERMO, | : | the Order of the Lehigh County Court |
| RACHEL DIXON, PRISCILA JIMENEZ, | : | of Common Pleas, Civil Division, at |
| LUIS JIMENEZ, ALLI LICONA AVILA | : | No. 2015-C-1547, dated September |
| AND IRIS VELAZQUEZ | : | 13, 2016. |
| | : | |
| | : | ARGUED:  December 6, 2018 |
| APPEAL OF: PRISCILA JIMENEZ & LUIS | : | |
| JIMENEZ | : | |

**CONCURRING OPINION**

**JUSTICE WECHT**                                    **DECIDED:  August 20, 2019**

Appellants in this matter, Priscila and Luis Jimenez, purport to raise two arguments.  First, they contend that Safe Auto's unlisted resident driver exclusion is unenforceable because it violates the Motor Vehicle Financial Responsibility Law. Second, they maintain that the same exclusion is unenforceable because it violates the *public policy* embodied in the Motor Vehicle Financial Responsibility Law.  If those two arguments strike the reader as indistinguishable, the reader is not to blame.  The blame instead lies with some of this Court's prior decisions, which, as I explain below, have misconstrued the common law principle that courts should not enforce contracts that violate well-established public policy.

In their first argument, the Jimenezes contend that the unlisted resident driver exclusion at issue here violates Subsections 1786(a) and (f) of the Motor Vehicle

Financial Responsibility Law. The learned Majority correctly rejects this argument. Subsections 1786(a) and (f) are unambiguous. The former states merely that all motor vehicles "shall be covered by financial responsibility."[1] The latter makes it a summary offense to operate a motor vehicle without the required financial responsibility. 75 Pa.C.S. §§ 1786(a), (f). Reading those two provisions literally, as we must, *see* 1 Pa.C.S. § 1921(b), it is beyond dispute that neither one by its terms prevents automobile insurers from including unlisted resident driver exclusions in their policies. Accordingly, I join the Majority's treatment of the Jimenezes' first issue.

But the Jimenezes have a second argument: they contend that unlisted resident driver exclusions are unenforceable because they violate the public policy underlying the Motor Vehicle Financial Responsibility Law. In my view, this is nothing more than an invitation to elevate the extra-textual (and hence speculative) legislative intent of the Motor Vehicle Financial Responsibility Law over the plain and unambiguous statutory language. This is an invitation that we must decline. *See id.* ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").[2]

---

[1] **"Financial responsibility"** is defined as "The ability to respond in damages for liability on account of accidents arising out of the maintenance or use of a motor vehicle in the amount of $15,000 because of injury to one person in any one accident, in the amount of $30,000 because of injury to two or more persons in any one accident and in the amount of $5,000 because of damage to property of others in any one accident. The financial responsibility shall be in a form acceptable to the Department of Transportation." 75 Pa.C.S. § 1702.

[2] To be sure, the General Assembly can, and sometimes does, announce broad legislative goals in the text of statutes. *See, e.g.,* 75 Pa.C.S. § 7802 ("The purpose of this chapter is to promote the safe, responsible and professional operation of motor carriers within this Commonwealth."); 31 P.S. § 626.2 ("It has been, and continues to be, the policy of this Commonwealth to protect producers and cooperatives against loss of payment for milk because of defaults by purchasers."). But no such provision exists in the Motor Vehicle Financial Responsibility Law.

That said, the rule that courts should not enforce contracts that are against "public policy" is, of course, a well-established common law principle. 5 WILLISTON ON CONTRACTS § 12:1 (4th ed. 1993) ("Bargains that comply with formal contractual requirements may nevertheless be unenforceable either by operation of express statutory prohibition or by operation of common law as being opposed to public policy."); *see* RESTATEMENT (SECOND) OF CONTRACTS § 178 (1981). Yet, this doctrine is exceptionally narrow; it applies only when a contract conflicts with a statutory enactment, a long-established governmental practice, or obvious ethical or moral standards. *Eichelman v. Nationwide Ins. Co.*, 711 A.2d 1006, 1008 (Pa. 1998); *Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755, 760 (Pa. 1994) ("Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest."). Courts have, for example, declined to enforce an agreement to appoint others to a political office,[3] an agreement to illegally influence legislation,[4] and an agreement that required the defendant to warn the plaintiff of any police investigations into the latter's activities.[5] We have stressed that, in the absence of a conflict with an identifiable, well-defined, and dominant expression of public policy, courts should decline to displace written agreements on the basis of generalized public policy concerns. *Hall*, 648 A.2d at 760

Here, the Jimenezes have not identified a statute, precedent, or long-established governmental practice indicating that unlisted resident driver exclusions are prohibited (or even disfavored) in Pennsylvania. Instead, they focus their attention on the "public policy" concerns that led (ostensibly) to the enactment of the Motor Vehicle Financial Responsibility Law in the first place. The Jimenezes must be forgiven for any deficiencies

---

[3]     *Hall v. Pierce*, 307 P.2d 292, 301 (Or. 1957).

[4]     *Kashfi v. Phibro-Salomon, Inc.*, 628 F. Supp. 727, 739 (S.D. N.Y. 1986).

[5]     *Jones v. Chevalier*, 579 So.2d 1217, 1218 (La. Ct. App. 1991).

in this argument, inasmuch as this Court itself has issued conflicting pronouncements regarding the General Assembly's putative intent in enacting the Motor Vehicle Financial Responsibility Law. Some opinions have emphasized the "legislative concern for the spiraling consumer cost of automobile insurance," *Paylor v. Hartford Ins. Co.*, 640 A.2d 1234, 1235 (Pa. 1994), while others have insisted that the law should be considered at least partially remedial. *See Williams v. GEICO*, 32 A.3d 1195, 1210 (Pa. 2011) (Saylor, J., concurring); *id.* at 1210 (Baer, J., concurring); *id.* at 1211 (Todd, J., concurring).

The flaw in the Jimenezes' argument is that it blurs the line between legislative intent (a statutory interpretation concept) and clearly-expressed statewide policy (a prerequisite to finding that a contract violates public policy). *See Burstein v. Prudential Prop. & Cas. Ins. Co.*, 809 A.2d 204, 221 (Pa. 2002) (Saylor, J., dissenting) ("It is crucial, however, to distinguish between reference to public policy as a means to determine the intent underlying a statute, and the direct application of overarching public policy to invalidate a contractual provision."). When courts are tasked with interpreting ambiguous statutes, they are free to ascertain the intent of the General Assembly by considering, among other things, "[t]he occasion and necessity for the statute," "[t]he circumstances under which it was enacted," "[t]he mischief to be remedied," "[t]he object to be attained," and "[t]he former law, if any, including other statutes upon the same or similar subjects." 1 Pa.C.S. § 1921(c). As the Majority notes, the Justices of this Court have evaluated those factors in the context of the Motor Vehicle Financial Responsibility Law and have reached divergent conclusions about what exactly the General Assembly likely sought to accomplish when it enacted the law. *See* Majority Opinion at 13-18.

In my view, the above-referenced multi-factor inquiry—which, again, is designed to help judges discern the meaning of ambiguous statutory language—is not especially useful when the question is whether there exists "a plain indication of" dominant public

policy "through long governmental practice or statutory enactments."[6] *Eichelman*, 711 A.2d at 1008; *id.* ("As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. . . . Only dominant public policy would justify such action."). Put differently, by importing the concept of (judicially surmised) legislative intent into the void-for-public-policy doctrine, the Jimenezes essentially get to litigate the same issue twice: first under the normal rule that unambiguous statutes must be construed strictly, *see* Majority Opinion at 12, and then again under the more liberal rule allowing judges to make their best guess about the meaning of unclear statutes, *see id.* at 13-18.

While the Majority apparently accepts that, in some cases, it would be appropriate to regard the legislature's supposed intent as a dominant expression of public policy for purposes of the void-for-public-policy doctrine, *see id.* (discussing the competing goals that the General Assembly allegedly sought to achieve when it enacted the Motor Vehicle Financial Responsibility Law), I believe that the "public policy" underlying the Motor Vehicle Financial Responsibility Law (*i.e.*, the legislative concern—or, more likely, concerns—that led to the law) is simply irrelevant to that doctrinal question. The "public policy" question to be answered here is a common law inquiry: whether there exists a well-defined, undisputed policy against enforcing unlisted resident driver exclusions in Pennsylvania. Allowing judicial speculation as to legislative intent to serve as definitive proof of the existence of such a policy, for purposes of the void-for-public-policy doctrine, effectively would circumvent the cardinal principle of statutory interpretation that unambiguous statutes must be construed strictly according to their plain language. It would, in other words, allow courts to disregard the unambiguous text of a statute "under

---

[6]    Indeed, if the Motor Vehicle Financial Responsibility Law contained a definite indication that unlisted resident driver exclusions are prohibited in Pennsylvania, then the Jimenezes would have prevailed on their first issue.

the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b); *see* Brief for the Jimenezes at 21 ("It is the policy of the Commonwealth of Pennsylvania to have insured drivers on its highways. The exclusion in the case at bar acts otherwise. This exclusion, therefore, should be invalidated.").

Thus, while I agree with the Majority that Safe Auto's unlisted resident driver exclusion is valid and enforceable, I would take this opportunity to clarify that divination of legislative intent alone cannot establish a dominant expression of public policy of the sort that is required under the substantive contract law principle that agreements which violate well-established public policy are unenforceable. Courts cannot invalidate contractual provisions based upon vague and nebulous public policy concerns, not even if the General Assembly most likely shared (though failed to codify) those same concerns.